**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>GREENWOOD FORGINGS, LLC,<br><br>　　　　　Debtor. | Chapter 11<br><br>Case No. 13-10027 (BLS) |

**DECLARATION OF DAVID JAEGER**
**IN SUPPORT OF FIRST DAY PLEADINGS**

I, David Jaeger, pursuant to 28 U.S.C. § 1746, declare as follows:

1.　　I am over the age of 18 and am otherwise fully competent to make this declaration. I am the President of Greenwood Forgings, LLC (the "**Debtor**"). In such capacity, I am knowledgeable to the extent set forth herein with the businesses, day-to-day operations, and financial affairs of the Debtor.

2.　　I submit this Declaration (the "**Declaration**") in support of the voluntary petition for relief filed by the Debtor under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and the motions and applications for related relief filed contemporaneously herewith (collectively, the "**First Day Pleadings**").[1]

3.　　I have reviewed the First Day Pleadings and, to the best of my knowledge, insofar as I have been able to ascertain after reasonable inquiry, I believe that approval of the relief requested therein is necessary to minimize disruption to the business operations of the Company so as to permit an effective transition into Chapter 11, preserve and maximize the value of the Debtor's estate, and, ultimately, achieve a successful reorganization. I also believe that, absent immediate Chapter 11 relief and continued conduct in the ordinary course of business operations

---

[1]　　All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Pleadings.

as set forth herein, and described in greater detail in the First Day Pleadings, the Debtor would suffer immediate and irreparable harm to the detriment of the estate.

4. Except as otherwise indicated, the facts set forth in this Declaration are based upon my review of relevant documents, information provided to me or verified by other executives or employees, and my experience, knowledge and information concerning the operations, financial positions, and industry generally of the Debtor. Unless otherwise indicated, the financial information contained in this Declaration is unaudited and subject to change. If called to testify, I would testify competently to the facts set forth herein based upon my personal knowledge, my review of relevant documents, and/or my opinion. I am authorized to submit this declaration on behalf of the Debtor.

5. Part I of this Declaration provides an overview of the business operations, capital structure, and financial standing of the Company, as well as the circumstances surrounding the Debtor's commencement of this Chapter 11 Case. Part II of this Declaration sets forth the facts relevant to the various First Day Pleadings in this case and the Debtor's business judgment in seeking such relief.

I.    **OVERVIEW OF DEBTOR'S BUSINESSES**

    A.    **CAPITAL STRUCTURE AND FINANCIAL STANDING**

        i.    **Debtor's Businesses**

6. The Debtor was purchased by Revstone Tool & Engineering, LLC in July of 2010 and became part of the Revstone group of automotive manufacturing companies. The Debtor is a premier designer and manufacturer of aluminum forgings to the automotive and powersports markets and has a long history of providing safety critical components in a timely manner to major Tier 1 and Tier 2 automotive suppliers. The primary manufacturing facilities of the

2

Debtor are located in Greenwood, South Carolina, and the Debtor employs approximately 50 people.

7.     Trends suggest that the global automotive market will recover from the downturn, particularly in products and technologies that promote increased fuel economy and reduced emissions. The Debtor, as a key producer of lightweight materials, has already benefited and expects to continue to benefit from an upward trend in this area.

**ii.    Financial Condition**

8.    Even though the Company is strategically placed to be a key supplier of parts to tomorrow's cars, the reverberations and transitions in the automobile industry since 2008 have had a lasting impact on the Company's operations. The Company has been negatively impacted by the continued lack of liquidity in the credit market for middle market borrowers. As a result, the Company has only been able to obtain financing at high interest rates with overly restrictive covenants. As a result, the Debtor has experienced covenant defaults that have led to litigation and resulted in a significant judgment against the Debtor and several of its affiliates. Specifically, Boston Finance Group, LLC ("**BFG**") obtained a Final Judgment on April 9, 2012 in the State Court of Michigan, Circuit Court for the County of Grand Traverse [Case No. 12-28975-CK] ("**MI State Court**") against the Debtor in the amount of $4,805,666.62, and for additional amounts with respect to several of the Debtor's affiliates, for an aggregate judgment amount of $26,713,464.89 plus interest (the "**Judgment**"). Combined with the overall slow recovery of the economy, the Judgment and the cumulative effect of the Debtor's high interest rate financing have generated liabilities significantly in excess of assets. The Debtor's current estimate of assets is $7,248,000 and current estimate of liabilities is $11,994,000.

**B.    EVENTS PRECIPITATING THE CHAPTER 11 FILINGS**

9.    Notwithstanding the above-referenced operational and liquidity challenges, the Debtor's parent company, Revstone Industries, LLC, has embarked on a comprehensive process of sales and financings in order to enable it to restructure in a thoughtful and comprehensive fashion, for the benefit of all of its constituents. In this regard, MPI LLC, an affiliate of the Debtor, recently sold certain of its assets pursuant to that certain Asset Purchase Agreement, dated October 19, 2012, to MPI Products LLC. Completion of this transaction allowed MPI, LLC to make payments to, inter alia, Wells Fargo in the amount of approximately $13.8 million

4

and Icon Agent LLC in the amount of approximately $42 million. Furthermore, on November

30, 2012, additional amounts were generated by a financing provided by Utica LeaseCo, LLC to

Contech Castings, LLC, an affiliate (the "**Contech Financing**"). From the proceeds of the

Contech Financing, an aggregate amount of $7,833.220.10 was used to pay BFG, on December

3, 2012, in satisfaction of the Judgment to defease the liabilities of Revstone Transportation,

Power-Tec Manufacturing, LLC,[2] Power-Tec Manufacturing, LLC,[3] and Saleen, LLC on account

of such Judgment. Despite as a matter of good faith having partially satisfied, as of December 3,

2012, the aforesaid Judgment, BFG remains unwilling to allow the Debtor any additional time to

reach a reasonable solution in respect of the remaining unpaid portion of the Judgment as it

relates to the Debtor and the other affiliates subject to the judgment, and has sought to seize

assets and enforce post-judgment remedies, including seeking the appointment of a receiver.

10.     The Company believes that its only option to sustain viable operations is for the

Debtor to initiate the Chapter 11 process, at least to a limited extent for now, in order to continue

to progress toward the Company's goal of reorganizing its operations and maximizing recoveries

to all creditors. The Debtor believes that the appointment of a receiver in the MI State Court

action would have only served to administratively deplete the estate while failing to maximize

the value of the estate for the creditors and all constituents. Therefore, the Debtor's best

alternative was to file this Chapter 11 proceeding.

## II.     REQUEST FOR EMERGENCY HEARINGS ON FIRST DAY PLEADINGS

11.     Absent the Court granting the relief requested in the First Day Pleadings on an

emergency basis, the Debtor will suffer immediate and irreparable harm.

---

[2]      A Michigan limited liability company.

[3]      A Delaware limited liability company.

12.     **Cash Management.**  The Debtor requests approval of its motion to (i) maintain its existing cash management system and bank account, (ii) continue use of existing checks and business forms, (iii) obtain a limited waiver of Section 345(b) of the Bankruptcy Code, and (iv) continue intercompany transactions (the "**Cash Management Motion**").

13.     Before the commencement of this case, the Debtor, in the ordinary course of their businesses, used an integrated, centralized cash management system to collect, transfer and disburse funds and to accurately record all such transactions as they were made (the "**Cash Management System**").  Importantly, the Cash Management System provides a substantially unified, integrated system of accounting for revenues and expenses.

14.     The Debtor maintains a single bank account (the "**Bank Account**").  The Bank Account is a general account with Bank of America (the "**Bank**").

| Bank | Location | Account Number | Account Type |
|---|---|---|---|
| Bank of America | Troy, MI | ******7075 | General |

15.     In connection with the Judgment in favor of BFG and against the Debtor and certain non-debtor affiliates,[4] BFG had requested a writ of nonperiodic garnishment upon the Bank, to which the Bank responded with a garnishee disclosure.  The Bank Account is not subject to a continuing garnishment.  The Debtor does not maintain any investment accounts.

16.     The Debtor's payroll processor is Ceridian Corporation ("**Ceridian**").  Ceridian maintains a payroll account on behalf of the Debtor and certain of the non-debtor affiliates at the Bank (the "**Payroll Account**"):

---

[4]     *See Boston Fin. Grp., LLC v. Power-Tec Mfg., LLC*, Case No. 12-28975-CK (Mich. Cir. Ct., Grand Traverse Cnty.).

| Bank | Location | Account Number | Account Type |
|------|----------|----------------|--------------|
| Bank of America | Concord, CA | ******2709 | Ceridian Payroll Trust |

17.    Each week, the Debtor processes payroll data and submits same to Ceridian. After disbursement, the Payroll Account balance reverts to zero dollars.[5]

18.    Continued use of the Cash Management System and the Bank Account during the pendency of this Chapter 11 case is essential to the Company's business operations.

19.    In sum, I submit that requiring Debtor to adopt new cash management systems and open new bank accounts at this early and critical stage of the Chapter 11 case would be expensive, impose administrative burdens, and cause needless disruption. As a result, the Debtor respectfully requests authority to continue the use of the Bank Account.

20.    **Employee Wages and Benefits Motion.** The Debtor requests approval of its Emergency Motion for Entry of Order (i) authorizing payment of prepetition wages, salaries, and employee benefits, (ii) authorizing continuation of employee benefit plans and programs postpetition, and (iii) directing all banks to honor prepetition checks for payment of prepetition employee obligations (the "**Employee Wages and Benefits Motion**").

21.    These obligations and benefits in respect of the Debtor's employees may include, without limitation, (a) unpaid prepetition wages, salaries and reimbursable business expenses earned or incurred prior to the Petition Date (collectively, the "**Prepetition Employee Obligations**") and (b) employee health and welfare benefit claims arising before the Petition Date, including, without limitation, (i) medical, dental, vision and prescription drug coverage; (ii) health savings accounts and flexible spending accounts for health and dependent care under

---

[5]    In connection with the Judgment in favor of BFG, BFG requested a writ of nonperiodic garnishment upon Ceridian, to which Ceridian responded with a garnishee disclosure. The Payroll Account is not subject to a continuing garnishment.

Section 125 of the Internal Revenue Code; (iii) basic life, executive life and voluntary life insurance; (iv) accidental death and dismemberment ("**AD&D**") insurance; (v) short-term and long-term disability benefits; (vi) counseling, (vii) a 401(k) savings plan, (viii) voluntary accident injury insurance, (ix) voluntary critical injury coverage and (x) paid time off ("**PTO**") (collectively, the "**Employee Benefits**").

22.    As of the Petition Date, the Debtor has approximately fifty (50) employees (the "**Employees**"). Currently, the majority of the Employees are based Greenwood, South Carolina. All of the Employees are either salaried employees or hourly. The Debtor has the following officers: Chairman, President, Secretary and General Counsel, and Assistant Secretary and Assistant General Counsel. In the ordinary course of the Debtor's businesses, the Employees earn and are paid salaries and/or other compensation every two weeks; more specifically the Debtor pays its hourly employees every two weeks and on alternate staggered weeks pays its salaried employees every two weeks. .

23.    As a general matter, one payroll account is used for paying the salaries and related employment benefits to hourly and salaried Employees every two weeks on alternating Fridays (collectively, the "**Payrolls**"). In addition, the Debtor is required by law to (i) match Social Security and Medicare taxes, (ii) based on a percentage of gross payroll, pay additional amounts for state and federal unemployment insurance and (iii) remit these payroll taxes to various taxing authorities (the "**Employer Payroll Taxes**"). The Debtor uses Ceridian Corporation ("**Ceridian**") as the Payroll processor. The Debtor estimates that the Payrolls for earned salaries total approximately $46,000 plus applicable Employer Payroll Taxes per pay period for salaried Employees and $41,000 plus applicable Employer Payroll Taxes per pay period for hourly Employees. The Debtor requests the authority to continue to pay regularly scheduled Payrolls,

including Employer Payroll Taxes, in the ordinary course of business, including any prepetition amounts that may have accrued but not become payable as of the Petition Date.

24.    In the ordinary course of business, the Debtor also causes certain Payroll deductions to be automatically made for Employee obligations, such as federal income taxes, Social Security and Medicare contributions, court-ordered garnishment and support payments, benefit plan insurance programs, and other similar programs (collectively, the "**Deductions**"). For a fee of approximately $1,000 a month, the Debtor outsources to Ceridian the task of making the Deductions and the Employer Payroll Taxes and remitting the amounts due to relevant governmental authorities or other proper third parties.

25.    To the extent that the Debtor is holding funds belonging to Employees that are collected from Employees and remitted to others, the Debtor maintains that such funds are not property of the bankruptcy estate.  The amounts deducted are generally held in trust by Ceridian until they are forwarded to third parties.  However, in an abundance of caution and to the extent that such funds relate to prepetition periods, the Debtor seeks authority to remit the applicable Deductions to appropriate governmental authorities and other third parties in accordance with the Debtor's regular policies and procedures.  Further, the Debtor seeks the authority, but not the direction, to continue using Ceridian to handle Payrolls and its related Deductions and Employer Payroll Taxes.

26.    Prior to the Petition Date and in the ordinary course of business, the Debtor reimbursed Employees for reasonable expenses incurred in performing their jobs, including, but not limited to, business-related travel expenses and cell phones (the "**Reimbursable Expenses**"). Reimbursable Expenses were incurred in the ordinary course of business with the expectation that such expenses would be reimbursed in accordance with past practice.    It would be

inequitable and would cause harm to the morale of Employees to deny reimbursement of such expenses. Moreover, it is essential to the continued operation of the Debtor's businesses that the Debtor be permitted to continue to reimburse Employees for such business-related Reimbursable Expenses incurred in the ordinary course of the Debtor's businesses, whether incurred by an Employee prepetition or postpetition. As of the Petition Date, the Debtor estimates that unpaid Reimbursable Expenses total approximately $3,000.00. Additional unpaid amounts that have not yet been submitted likely total approximately $1,000 based on prior months.

27.     The Employees are each full-time employees scheduled to work more than thirty (30) hours per week, citizens or legal residents of the United States and, therefore, eligible for various standard employee health and welfare benefits, including, without limitation, the Employee Benefits (defined in paragraph 6 above).

28.     Medical, Dental, Vision and Prescription Drug Coverage: Employees are offered three (3) levels of voluntary medical plans self-funded by the Debtor through Ascalon Enterprises, LLC (an affiliate of the Debtor): Gold, Silver and Bronze (the "**Medical Plan**"). Medical Plan participants are also offered prescription drug coverage. Voluntary vision coverage and dental insurance are provided through Guardian. For the standard medical benefits, the Debtor pays a portion of the cost (premiums are approximately $27,000 per month), and the Employee is responsible for paying the balance of the premium through payroll deductions. For the standard vision benefits, the Employee is responsible for paying the entire premium through payroll deductions. For the standard dental benefits, the Debtor pays premiums of approximately $100 per month, and the Employee is responsible for paying the balance of the premium through payroll deductions.

29.    <u>Flexible Spending Accounts</u>:  Employees may elect to enroll in flexible spending accounts ("**FSAs**") for health and dependent care.  FSAs permit employees to make pretax payroll contributions up to $2,500 per year for health care expenses for employees and eligible dependents and up to $5,000 per year per household for dependent care.  The Employee's gross pay is reduced by an amount equal to the Employee's contributions, as elected annually during the open enrollment period.  McGregor and Associates ("**McGregor**") is the third-party administrator for the FSA.

30.    <u>Health Savings Accounts</u>:  Employees may elect to enroll in health savings accounts ("**HSAs**").  HSAs permit employees to make pretax payroll contributions of up to $3,250 per individual or $6,450 per family.  The Debtor contributes $50 per month per employee and the Employee's gross pay is reduced by an amount equal to the Employee's contributions, as elected annually during the open enrollment period.  McGregor is the third-party administrator for the HSA.

31.    <u>Life, AD&D, Short-Term and Long-Term Disability Insurance</u>:  Employees are provided basic life and AD&D coverage and short-term and long-term disability benefits through the Debtor's Guardian Term Life, Short and Long Term Disability Plan.  Salaried executives are provided supplemental disability coverage through the Debtor's Guardian Supplemental Individual Disability Income Insurance.  Basic life and accidental death and dismemberment insurance coverage is available to all Employees of $50,000.  Basic short-term disability benefits are provided for salaried Employees who are temporarily unable to work due to injury or illness up to 100% of base salary with a maximum of $5,000; basic long-term disability is up to 60% of base salary with a maximum of $8,000 per month.  Approximately two (2) of the Employees are

eligible for executive supplemental long-term disability which provides an addition potential coverage of $7,000per month. The cost is paid in full by the Debtor.[6]

32.     Employee Assistance Program:    The Employee Assistance Program ("**EAP**") through Guardian provides free, confidential professional counseling to assist employees through difficult times of marital, family, financial or legal problems, drug or alcohol abuse, or other personal issues.

33.     The 401(k) Savings Plan:    All Employees may enroll in the Debtor's 401(k) plan. The plan is administered by Wells Fargo.  Participating Employees may defer a portion of their annual compensation, subject to maximum limitations set by the Internal Revenue Service.  The Debtor has discretion to match for the 401(k) plan of the Employees.

34.     PTO:    All Employees receive PTO as part of their overall compensation.  On an annual basis, salaried Employees accrue twenty (20) days of PTO if the Employee has ten (10) or more years of employment with the Debtor or if the Employee is an Executive, unless there is an employment agreement to the contrary.  If the salaried Employee has one (1) to ten (10) years of employment with the Debtor, fifteen (15) days of annual vacation is provided unless there is an employment agreement to the contrary.  Salaried Employees with less than one (1) year of employment with the Debtor accrue PTO days monthly, up to fifteen (15) days, unless there is an employment agreement to the contrary.  Upon termination, salaried Employees are paid for

---

[6]     In addition, the Debtor offers certain voluntary elections that the Employees may opt into which may result in related deductions from the Employee's paycheck.  These programs include, but are not limited to, (i) AFLAC Group Accident Injury Insurance (voluntary supplemental coverage), (ii) Guardian Critical Illness Coverage (voluntary supplemental coverage), (iii) Guardian Voluntary Term Life Insurance, (iv) Ascalon Enterprises Employee Medical Benefits Plan, (v) Revstone Industries Dental Care Plan, (vi) Revstone Industries Vision Coverage (vii) Revstone Industries Term Life, Short and Long Term Disability Plan (voluntary for hourly employees), (viii) Revstone Flexible Spending Accounts (Healthcare and Dependent Care), and (ix) Revstone Health Savings Account.

earned but unused PTO. On an annual basis, hourly Employees accrue twenty (20) days of PTO if the Employee has fifteen (15) or more years of employment with the Debtor. If the hourly Employee has ten (10) to fifteen (15) years of employment with the Debtor, fifteen (15) days of annual vacation is provided. If the hourly Employee has one (1) to ten (10) years of employment with the Debtor, ten (10) days of annual vacation is provided. Hourly Employees with less than one (1) year of employment with the Debtor accrue PTO days monthly, up to nine (9) days. Upon termination, hourly Employees are paid for earned but unused PTO. The Debtor anticipates that Employees will utilize PTO postpetition, including certain PTO that may have accrued before the Petition Date. The Debtor seeks authority (but not direction) to honor all earned PTO in the ordinary course consistent with the existing guidelines and policies described in this paragraph, regardless of whether it accrued during the pre or post-petition period.

35.     As of the Petition Date, the Debtor was obligated to pay certain premium contributions to or provide benefits under the foregoing Employee Benefits programs, plans and policies. The Debtor estimates the average monthly cost for Employee Benefits and related administrative fees is $43,000. That total is calculated based upon the following summary of estimated monthly fees due by the Debtor: (i) Medical premiums ($27,000); (ii) Dental premiums ($1100); (iii) Dental administrative fee ($200); (iv) FSA/HSA administrative fee ($250.00); (v) HSA employer contribution ($1100); (vi) salaried and hourly basic life/AD&D/ Short-Term Disability/Long-Term Disability premiums ($2600) and short term disability claims of approximately $10,500 a month (and (viii) Executive Disability premiums ($140.00).

36.     Given the importance of the continued efforts of the Employees to its contemplated restructuring, I believe that the authority (i) to pay the Prepetition Employee

13

Obligations and Employee Benefits, and (ii) to continue the current Employee Benefits postpetition is in the best interests of the Debtor and its estate.

37.     **Insurance Motion**.  The Debtor requests approval of its emergency motion for authorization to (i) continue prepetition insurance program and (ii) pay any prepetition premiums and related obligations (the "**Insurance Motion**").

38.     In the ordinary course of its business, the Debtor maintains a carefully designed insurance program (the "**Insurance Program**").  This program includes eight insurance policies that were in effect as of the Petition Date, providing millions in dollars of coverage, including, but not limited to, policies covering general liability, umbrella coverage, workers' compensation, executive risk management, employed lawyers professional liability, and directors' and officers' liability (collectively, the "**Policies**").  These Policies are provided by several different insurance carriers (the "**Carriers**").  Attached hereto as **Exhibit A** and incorporated herein by reference is a comprehensive list of the Policies identified by the Debtor to date by type of coverage, Policy number, identity of Carriers, total premium for each Policy, and other salient information.

39.     The Debtor and certain non-debtor affiliates are responsible for approximately $4,200,000 per year in aggregate premiums and related fees to maintain the Insurance Program. These Policies provide insurance coverage for the both the Debtor and those non-debtor affiliates, and premiums are paid on a monthly basis.  The continuation of these policies is both necessary and critical to the Debtor's ability to operate its businesses.

40.     The Debtor uses Todd Associates, Inc. (the "Broker") to procure and coordinate insurance coverage for itself and its non-debtor affiliates.  The Broker's services are critical to maintaining and renewing the various component policies within the Insurance Program.  As part of its services, the Broker handles all administrative tasks involved with the routing and payment

of premiums to the Carriers. Payment of the premiums to the Broker is allocated among the Debtor and its non-debtor affiliates, and any payments made by the Debtor or its non-debtor affiliates on behalf of another affiliate create an intercompany obligation between such affiliates. The Broker's fee is directly subsumed in the billings for premiums it provides to the Debtor and its non-debtor affiliates.

41.    By obtaining the required insurance coverage for itself and the non-debtor affiliates on a combined basis, the Debtor has been able to realize substantial savings and efficiencies in the cost of its Insurance Program generally. The Debtor submits that it would not be feasible to separate out its operations and other insurance needs from those of its non-debtor affiliates and obtain replacement insurance coverage at a reasonable cost or within a reasonable time frame without exposing the Debtor to significant risk of disruption and increased expense.

42.    Furthermore, in many cases, the coverage provided by the Policies is required by various regulations, laws and contracts that govern the Debtor's businesses under applicable non-bankruptcy law. Likewise, the U.S. Trustee Guidelines require the Debtor to maintain adequate insurance coverage. Such coverage could not be provided without continuation of the Insurance Program.

43.    As a result, I believe that the authority to make the payments required to continue its Insurance Program as requested in the Insurance Motion is in the best interests of the Debtor and its estate.

44.    **Utility Motion.** The Debtor requests approval of its motion for interim and final orders to (i) prohibit utility companies from discontinuing, altering or refusing service, (ii) deem utility companies adequately assured of future payment, and (iii) establish procedures for determining requests for additional adequate assurance (the "**Utilities Motion**").

15

45.    In connection with the operation of the Company's businesses, the Debtor currently utilizes telephone and internet services and gas ("**Utility Services**") through certain accounts with utility companies (collectively, the "**Utility Companies**"), as set forth on Exhibit A to the Utilities Motion. By its motion, the Debtor seeks to implement procedures to provide its Utility Companies with adequate assurance of future payment.

46.    In the aggregate, the amounts of the average monthly billings for services provided by the Utility Companies total approximately $52,000. The prepetition accounts that may have not yet been billed by the Utility Companies are likely minimal.

47.    The Debtor requests that an amount equal to the greater of (i) one-half (1/2) of one month's utility payment (based on the average monthly payment for such utility services during the three (3) months prior to the Petition Date) or (ii) the deposit currently held by such utility, provides adequate assurance of payment and that no additional deposit (hereinafter referred to as an "**Adequate Assurance Deposit**"), security, or other assurance of payment should be required.

48.    As a result, I believe that the authority to pay the Utility Companies as requested in the Utilities Motion is in the best interests of the Debtor and its estate.

**Cash Collateral Motion.** The Debtor requests approval of its motion for interim and final orders to (i) authorizing the Debtor to use cash collateral, and (ii) granting adequate protection to Bridgeport Capital Funding LLC ("**Bridgeport**") (the "**Cash Collateral Motion**").

49.    In connection with the operation of the Company's businesses and due to the various garnishments that BFG had filed, the Debtor has been meeting its payroll obligations and inventory needs by selling the scrap metal that it uses in production and by having some of its customers pre-pay for their product. Due to the reduced production that occurred over the

16

holidays, the amount of scrap metal that the Debtor generated to sell and meet its payroll obligations is less than normal. Without access to its Cash Collateral, the Debtor will have difficulty meeting its payroll obligations for Friday January 11, 2013. In order to meet its payroll obligations, the Debtor is required to wire funds to its payroll processor on January 10, 2013. By its motion, the Debtor seeks to gain access to its Cash Collateral to meet its ordinary business expenses and to provide Bridgeport, its secured lender, with adequate protection.

50.    The value of Bridgeport's lien is approximately $250,000. The Debtor has approximately $1.0 million in outstanding receivables that the Debtor believes can be collected. The Debtor requests that it be allowed to access its Cash Collateral to meet its ordinary business expenses including payroll. In consideration for allowance to use its Cash Collateral, the Debtor proposes to provide Adequate Protection to Bridgeport in the form of replacements liens, a superpriority administrative expense claim and a waiver of Section 506(c) surcharge.

51.    I believe that the authority to use Cash Collateral and the adequate protection provided to Bridgeport is in the best interests of the Debtor and its estate.

*[remainder of page intentionally left blank; signature page follows]*

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 9, 2013.

_____

David Jaeger, President